UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DAMON HEINTZ,

               Petitioner,

     v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security
Administration,

               Respondent.

Case No. 1:17-CV-00450-CWD

**MEMORANDUM DECISION
AND ORDER**

## INTRODUCTION

Currently pending before the Court is Damon Heintz's Petition for Review of the

Respondent's denial of social security benefits, filed on November 1, 2017. (Dkt. 1.) The

Court has reviewed the Petition for Review and the Answer, the parties' memoranda, and

the administrative record (AR), and for the reasons that follow, will reverse the ALJ's

determination and remand the decision of the Commissioner for consideration of an

award of benefits.

## PROCEDURAL AND FACTUAL HISTORY

Petitioner filed an application for a period of disability and disability insurance

benefits under Title II, and a second application under Title XVI for supplemental security income, on August 4, 2014. These applications were denied initially and on reconsideration, and a hearing was conducted on November 10, 2016, before Administrative Law Judge (ALJ) David Willis. The ALJ heard testimony from Petitioner, medical expert Ronald Halston, Ph.D., and a vocational expert. The ALJ conducted a supplemental hearing on June 20, 2017. He heard testimony at that time from Petitioner, medical expert Dawn Crosson, Psy.D., and a second vocational expert. ALJ Willis issued a decision on July 28, 2017, finding Petitioner not disabled.

Petitioner timely requested review by the Appeals Council, which denied his request for review on September 21, 2017. Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the alleged amended disability onset date of April 1, 2013, Petitioner was thirty-seven years of age. Petitioner obtained a high school education,[1] and his past relevant work experience includes work as a law enforcement officer, fence and deck fabricator supervisor, and bicycle mechanic. (AR 333, 334.)

Petitioner reported a history of head trauma. He stated that he previously trained, taught, and fought full contact mixed martial arts and combative defensive tactics. (AR 382.) He also sustained head trauma as a result of multiple vehicle accidents. In 2008,

---

[1] The ALJ did not elaborate on Petitioner's education. Review of the medical records reveals that Petitioner reported he obtained an Associate degree in communications, and a Bachelor of Arts degree in criminal justice. (AR 789.)

Petitioner was involved in an ATV rollover accident in which a close friend died as a result of the injuries he received. (AR 756.) Petitioner reported being injured in several vehicle and motorcycle accidents that occurred in March, April, and October of 2013. (AR 56, 756, 1126.) At the hearing, Petitioner's representative proposed an amended disability onset date to reflect that Petitioner's mental impairments worsened due to two motor vehicle accidents that occurred in March and April of 2013. (AR 56.) The ALJ agreed, and the disability onset date was amended to April 1, 2013. (AR 56.)

Petitioner's medical records date back to January 13, 2010, when Petitioner sought care for cervical, thoracic, and low back pain with lower extremity radiation of symptoms, which Petitioner reported were ongoing since a February 2008 ATV accident. (AR 719.) Diagnostic imaging tests revealed degenerative changes of the cervical spine, and mild degenerative change of the lumbosacral spine. (AR 724 -728.) Petitioner reported also suffering from anxiety after the 2008 accident, because he had witnessed his friend's death before paramedics arrived at the accident scene. (AR 724.)

After the motor vehicle and motorcycle accidents in 2013, Petitioner began complaining of new onset neck pain with radiculopathy, thoracic pain, and low back pain with radiculopathy. (AR 1126.) He sought treatment on November 12, 2013, from the Nevada Comprehensive Pain Center. (AR 1126-1130.)[2] Diagnostic imaging tests revealed mild right foraminal narrowing at C5-C6, and decreased disc signal and disc

---

[2] At that time, Petitioner resided in Nevada.

height, with moderate foraminal narrowing at C6-C7; and a normal brain CT. (AR 1136.) An MRI of the brain performed on November 29, 2013, was negative for any abnormality. (AR 797.) He was prescribed Norco and Ibuprofen for pain. (AR 1131.) He was diagnosed also with posttraumatic stress disorder as a result of the 2008 ATV accident. (*Id.*).

On January 26, 2014, Petitioner discussed the results of his cervical MRI with health care providers during a visit at the Nevada Comprehensive Pain Center. (AR 1135.) Examination results revealed tenderness to palpitation in his neck, thoracic spine, and lumbar spine, with decreased range of motion in his cervical and lumbar spine. (AR 1137.) Petitioner was diagnosed with cervical facet syndrome, thoracic facet syndrome, lumber facet syndrome, cervical radiculitis/radiculopathy, and thoracic/lumber radiculitis/radiculopathy. (AR 1137.)

Thereafter, Petitioner moved to Idaho, and established care on March 4, 2014, with Michael Eastman, PA-C, at the Saint Alphonsus Pain Management Center. (AR 788.) Dr. Eastman ordered additional imaging studies at that time. (AR 799-801.) A cervical MRI revealed spondylitic ridging at the C6-C7 level, resulting in mild canal stenosis and mild/moderate bilateral foraminal stenosis with possible mass effect on the existing bilateral C7 roots. (AR 799.) Dr. Eastman referred Petitioner to Helen Holley, Ph.D., for evaluation and treatment of his anxiety and PTSD. (AR 756, 790.)

At his initial visit with Dr. Holley on March 27, 2014, Petitioner reported that, as a result of his more recent motor vehicle accidents in 2013, he experienced an increase in

seizures, nightmares, short-term memory loss, and long-term retrieval difficulties, as well as irritability, insomnia and difficulty concentrating. (AR 784.) Dr. Holley's assessment included a diagnosis of posttraumatic stress disorder, with a history of traumatic brain injury with subsequent seizure disorder, chronic low back pain with radicular symptoms, and degenerative disc disease of the cervical spine. (AR 786.) Dr. Holley treated Petitioner on June 16, July 14, August 11, September 3, and September 30, 2014. (AR 756 – 784, 890.)

On April 17, 2014, physical therapist Shaun Murphy evaluated Petitioner for his left sided neck pain, radicular symptoms, mid back and low back pain. (AR 938.) Petitioner reported an increase in seizure activity after a motor vehicle accident on October 18, 2013, and an increase in pain along his left side, which included his neck, trunk, arm and leg. (AR 938.) Murphy's examination noted guarded posturing, pain produced in Petitioner's left upper extremity, and diminished sensation along the left side of Petitioner's body. (AR 939.) Murphy noted also that Petitioner had decreased sensation and numbness on the left side of his body from his neck to his lower extremities. (AR 939.)

Petitioner also saw psychiatrist Jeremy Handy for an initial diagnostic evaluation on June 11, 2014, upon referral from Dr. Holley. (AR 743, 918.) Petitioner reported difficulty sleeping and concentrating, and an increase in anxiety symptoms. (AR 743.) Dr. Handy diagnosed major depressive disorder, posttraumatic stress disorder, centralized anxiety disorder, and attention deficit hyperactivity disorder (ADHD), noting a history of

chronic pain, seizures, and head injury. (AR 745.) Dr. Handy began treatment of Petitioner's psychiatric symptoms with medication.

On June 24, 2014, Petitioner presented to the emergency room seeking a referral to a neurologist for treatment of his seizures, and to a primary care physician. (AR 735.) Petitioner was seen and evaluated, and referred for follow up care. (AR 735.)

Petitioner's second visit with Dr. Handy occurred on July 9, 2014. (AR 904.) Petitioner stated that his ADHD symptoms had improved with Adderall, but that he had a "couple seizures in the past month." Petitioner stated that he did not lose consciousness, but that he "blanked out" or had jerking motions over part of his body. (AR 904.) Dr. Handy noted that Petitioner's wife drove him everywhere because of his seizures. (AR 904.) Petitioner reported his depression had improved, and that he had been sleeping better since taking Xanax. Upon examination, Dr. Handy noted Petitioner had no abnormal motor movements, normal gait and station, stable affect, and his speech exhibited a regular rate and volume. (AR 905.)

At his third visit with Dr. Handy on September 3, 2014, Petitioner reported that the prescribed medications helped alleviate his symptoms of anxiety and depression, as well as improved his PTSD symptoms and insomnia. (AR 747.) However, Petitioner reported that, with the medication, he had experienced several seizures, where he blacked out and had jerking motions over parts of his body. (AR 749.) Petitioner also experienced dizziness, which Dr. Handy observed during the appointment. (AR 902.)

On September 5, 2014, Petitioner sought care from Certified Nurse Practitioner

Kelly Whitehead-Price for a preventative exam. (AR 872.) Petitioner's chief complaint was pain, reported as eight out of ten on the numeric pain intensity scale. Examination findings were noted as normal. (AR 874.) Whitehead-Price recommended pressure point injections to address Petitioner's pain. (AR 872.)

Petitioner was referred to Dr. James Redshaw at Idaho Neurology, who examined Petitioner on September 19, 2014, and evaluated Petitioner's seizure complaints. (AR 814.) Petitioner's wife reported witnessing the seizures, which involved motor convulsions and loss of awareness, and a postictal phase accompanied by confusion and speech disturbance. (AR 814.) An EEG performed on September 17, 2014, and discussed with Petitioner at his September 19, 2014 visit with Dr. Redshaw, demonstrated right central parietal dysrhythmia at the C4/P4 region. The features were nonspecific and nondiagnostic. (AR 814, 846.) Dr. Redshaw noted that Petitioner's witnessed seizure events reported by his wife were in keeping with a history of complex partial seizures. (AR 815.) Dr. Redshaw prescribed Dilantin, an anticonvulsant medication. (AR 815.)

On October 1, 2014, Petitioner followed up with Dr. Handy. (AR 900.) Dr. Handy noted that he had increased Petitioner's ADHD medication since his last appointment on September 3, 2014, and Petitioner reported his depression and anxiety symptoms had improved. Petitioner stated also that he had been working on his car in the evenings. (AR 900.) Dr. Handy noted Petitioner walked with a normal gait, had no abnormal motor movements, and his affect was stable. (AR 900.)

On October 3, 2014, Petitioner followed up with Whitehead-Price for his chronic

pain, reporting that he had an acute spasm of his upper neck and shoulders after working on his truck. (AR 866.) Exam findings revealed trapezius muscle spasm, while laboratory results revealed anemia. (AR 869, 874.)

On November 3, 2014, Petitioner reported to Whitehead-Price that he experienced increased back pain after working on a car and breaking a torque wrench while trying to loosen a nut. (AR 860.) He reported also less extreme bladder urgency, but worsening pain. Upon examination, Whitehead-Price noted Petitioner had an antalgic gait, painful lumbar range of motion, and appropriate mood and affect. (AR 860 – 863.)

On November 3, 2014, Petitioner saw Michael Eastman, PA-C,[3] complaining of increased pain from the colder weather and exacerbation of his pain after rebuilding the fuel pump and gas system on his vehicle. (AR 887.) Petitioner had a positive test for alcohol, and admitted to Eastman that he had been taking his pain pills more often than as prescribed. (AR 888.) Helen Holley, Ph.D., who appears to have been Eastman's supervisor, signed the progress note that day as well. (AR 886.) On November 14, 2014, Petitioner received trigger point injections for his pain from Dr. Patrick Farrell. (AR 885.)

On December 1, 2014, Petitioner sought follow up care for pain management and seizures from Whitehead-Price. (AR 855.) Petitioner reported to Whitehead-Price that his pain and mental health symptoms were better controlled, but that his absence type

---

[3] Eastman was a member of the Saint Alphonsus Pain Management Group, which group included clinical psychologist Hellen Holley, Ph.D., and Patrick Farrell, M.D. (AR 889.)

seizures[4] were increasing in frequency and the postictal period was lengthening.

Petitioner was taken to the Saint Alphonsus Regional Medical Center emergency department on December 5, 2014, by his sister and his wife, after he had awaken feeling shaky, dizzy, and agitated. (AR 838.) The emergency room physician noted no generalized seizure activity, and his impression was that Petitioner's symptoms were related to anxiety and stress. Follow up with neurologist Dr. Redshaw was recommended. (AR 839.)

At a follow up appointment with Dr. Redshaw on December 9, 2014, Petitioner's wife reported he continued to have "spells," with tonic shaking of his limbs. (AR 826.) Upon examination, Dr. Redshaw noted Petitioner was unsteady on his feet. (AR 826.) Because of Petitioner's reported recurrent seizure events, Dr. Redshaw ordered a 48-hour home EEG ambulatory study. (AR 826.)

On December 21, 2014, Petitioner visited the Saint Alphonsus Regional Medical Center emergency room after a fall while walking his dog. (AR 832.) He reported symptoms of headache, and pain in his cervical, thoracic, and lumbar spine. (AR 832.) Examination revealed diffuse tenderness overlying the cervical, thoracic and lumbar spine. (AR 832.) Imaging studies obtained in the emergency department did not show evidence of a fracture, and a head CT was normal. (AR 834 – 837.)

---

[4] An absence seizure is "a seizure characterized by impaired awareness of interaction with, or memory of, ongoing events external or internal to the person; may comprise the following elements: mental confusion, diminished awareness of environment, inability to respond to internal or external stimuli, and amnesia." 807190 absence seizure, STEDMANS MEDICAL DICTIONARY 807190.

**MEMORANDUM DECISION AND ORDER - 9**

After his emergency room visit, Petitioner followed up with Whitehead-Price on December 23, 2014, complaining of chest pain and a non-productive cough. (AR 851, 1007.) Whitehead-Price's orders included a note to research treatment options "given PTSD status patient." (AR 854.)

Petitioner returned to see psychiatrist Dr. Handy for a three month follow up appointment on January 7, 2015. (AR 907.) After his last appointment, Dr. Handy noted Petitioner had called the office and reported an increase in anxiety symptoms. During the appointment, Petitioner reported increased PTSD symptoms, difficulties with and an increase in his seizure activity, mental fatigue, drowsiness, and difficulty with clear thoughts and clear speech. Dr. Handy observed during the appointment that, "I have never seen him in this condition where he is dizzy when he is walking, his speech is slow, slightly slurred." (AR 907.) Dr. Handy adjusted Petitioner's medications, concerned that the effects of Xanax, Oxycodone, Soma, and Dilantin may be having additive effects and causing "foggy brain." (AR 907.) Dr. Handy noted Petitioner had mild confusion, did not answer questions all the time appropriately, and paused before answering questions, all of which was abnormal. (AR 908.)

On January 19, 2015, Petitioner sought follow-up care from Whitehead-Price for pneumonia and continued chest pain. (AR 1001.) Petitioner complained of shortness of breath. However, a chest x-ray revealed no abnormalities. (AR 1016.)

The 48-hour EEG study Dr. Redshaw ordered was performed between January 20 and 25, 2015. (AR 1104.) Although no epileptiform activity was recorded, Petitioner had

one clinical event with a total of three combined push button events. (AR 1104.) He was described during the clinical event as "sobbing uncontrollably, body shaking, unable to communicate, difficulty with breathing [and] confused mental status. He was disoriented." The features were consistent with a nonepileptic event. (AR 962, 1104.)[5]

Dr. Redshaw's impression of the EEG results was that Petitioner's clinical events appeared to be nonepileptic, and most consistent with a conversion disorder or, less likely, a somatoform disorder. (AR 962.) Dr. Redshaw suspected also that Petitioner exhibited multiple elements of secondary gain. (AR 962.) However, Dr. Redshaw noted that care would focus on continued work with a psychologist to identify the underlying trigger for Petitioner's clinical events and presentation. (AR 962.)

On January 27, 2015, Whitehead-Price examined Petitioner at his follow-up appointment. Petitioner was complaining of pain in his back and neck, as well as symptoms of pneumonia. (AR 997.) Whitehead-Price continued Petitioner's pain medications.

At Petitioner's next visit with psychiatrist Dr. Handy on February 18, 2015, the psychiatrist noted Petitioner looked much improved from his prior visit on January 7, 2015. (AR 925.) Dr. Handy noted Petitioner appeared clear minded, healthy, and with good energy. Petitioner reported he continued to experience a lot of anxiety, frequent

---

[5] Petitioner's wife described the event to Dr. Redshaw. She reported Petitioner began shaking, sobbing uncontrollably, became unable to communicate, and had difficulty breathing along with confusion. (AR 962.) Petitioner walked outside to his car, became confused and disoriented, and crawled back on the ice to his house. (AR 962.)

panic attacks and nightmares. Dr. Handy's mental status examination noted Petitioner had a normal gait and station, no abnormal motor movements, and exhibited a depressed and anxious mood. (AR 926.) Dr. Handy noted also that Petitioner paused in his speech, and had to think about what he was saying, or he could not get the words out, and he noted observing some thought blocking. (AR 926.) Dr. Handy adjusted Petitioner's medication. (AR 927.)

On February 23, 2015, Petitioner saw Whitehead-Price for a follow-up appointment. (AR 989.) Petitioner reported an increase in his seizures. Petitioner was thought also to be suffering from pneumonia. However, a chest x-ray did not yield abnormal results. (AR 1015.)

A March 17, 2015 brain MRI without and with intravenous contrast revealed no evidence of an acute intracranial abnormality. (AR 1014.)

On April 13, 2015, Petitioner saw Jason Gage, Ph.D., for a neuropsychological consultative evaluation to assist with differential diagnosis and treatment recommendations. (AR 942.) Petitioner reported decreased functioning over the past year, with episodes of wandering off, poor coordination, tremors, staring spells, and difficulty with balance and word finding. (AR 948.) At that time, Dr. Gage's diagnosis was "posttraumatic stress disorder and rule out conversion disorder as well as neurocognitive disorders." (AR 960.) Petitioner would see Dr. Gage several more times, on April 30, May 18, and May 19, 2015, to complete all neuropsychological testing before Dr. Gage dictated a full neuropsychological evaluation report. (AR 942.)

Petitioner was accompanied by his wife to all of his appointment with Dr. Gage.

Later on April 13, 2015, Petitioner saw Dr. Holley for supportive psychotherapy and behavior coping. (AR 1062.) This was his first session with Dr. Holley since December 30, 2014. (AR 1063, 1066.) Petitioner reported having more frequent seizures, which had been videotaped by his wife and which Dr. Holley watched during the session. (AR 1063.) Dr. Holley discussed Dr. Gage's most recent neurological evaluation with Petitioner, and "noted possible conversion disorder as a rule out based on findings." (AR 1063.) Upon examination, Dr. Holley noted frequent pain behaviors and bilateral hand tremors. She noted also that Petitioner appeared agitated, and that his thought content showed somatic preoccupation and helplessness. (AR 1063.)

On April 22, 2015, Petitioner saw psychiatrist Dr. James Piktel for an intake appointment upon referral from Dr. Handy.[6] (AR 922.) Dr. Piktel noted "a lot of thought blocking," but that Petitioner appeared to be an accurate historian. The chief complaints noted were posttraumatic stress disorder, major depressive disorder, generalized anxiety disorder, ADHD, and chronic pain in the context of traumatic brain injury. (AR 922.) Dr. Piktel's mental status examination noted that Petitioner's speech was articulate, but not coherent, with latency and thought blocking. (AR 923.) Dr. Piktel's assessment was that Petitioner met "the criteria for cognitive disorder not otherwise specified at this juncture," based upon a history of traumatic brain injury; posttraumatic stress disorder; major

---

[6] Dr. Piktel appears to be a member of the same practice group as Dr. Holley.

depressive disorder; and generalized anxiety disorder. (AR 923.)

Whitehead-Price examined Petitioner on April 30, 2015, for a pain management follow-up. (AR 985.) Petitioner described his pain at level eight out of ten. (AR 986.)

On May 10, 2015, Petitioner sought treatment at the emergency department complaining of worsening back pain radiating from below the base of his skull and down his back and left leg. (AR 1030, 1089.) Petitioner reported difficulty walking and urinary incontinence. (AR 1030.) The emergency department notes document Petitioner's history of traumatic brain injury with residual cognitive deficits. Examination revealed tenderness to the left cervical area and lower thoracic spine. (AR 1032, 1038.) The emergency department discharged Petitioner with a recommendation to follow up with his primary care provider.

At his follow-up appointment on May 12, 2015, Whitehead-Price noted Petitioner was complaining of pain, and was tender to the touch at his left upper extremity. (AR 980, 982.) Petitioner stated he was awaiting the results of his neuropsychological testing. Whitehead-Price noted that Petitioner continued to exhibit symptoms of delayed communication, and reported episodes of "spacing out." (AR 980.) Petitioner also reported urinary incontinence. (AR 980.)

Dr. Gage completed his neuropsychological evaluation on May 19, 2015. (AR 948.) Dr. Gage reported that Petitioner appeared to pause a lot and need time to think during the testing appointments, but that his effort on testing appeared to be good. (AR 950.) Testing revealed average verbal skills, but a significant deficit in verbal memory.

**MEMORANDUM DECISION AND ORDER - 14**

Petitioner showed some difficulties with visual memory, poor recognition memory, poor immediate recall, and poor delayed recall. Despite problems with other areas of memory, Petitioner showed "decent attention and working memory." (AR 950.) Petitioner showed moderate difficulties with verbal fluency, but had good visuospatial skills and perceptual reasoning. (AR 950.)

Dr. Gage noted Petitioner had the most difficulty with general processing speed, and scored in the first percentile with regard to fine motor dexterity and processing speed on the Grooved Pegboard Test. (AR 951.) However, Petitioner did not demonstrate difficulties with executive functioning. (AR 950.) Further, test results indicated some over reporting of symptoms on the MMPI-2 pertaining to personality and psychopathology. (AR 951.) Dr. Gage's assessment was that Petitioner's poor processing of information secondary to extreme psychological distress constituted the most likely cause of Petitioner's cognitive difficulties. He stated also that the medical findings "seem to be pointing to more of a conversion disorder or nonepileptic psychogenic seizure disorder" to explain the attacks Petitioner had been demonstrating. (AR 952.) Dr. Gage's provisional diagnosis was conversion disorder with attacks or seizures, posttraumatic stress disorder, and major depressive disorder. (AR 954.)

Dr. Holley treated Petitioner on May 20, 2015. (AR 1058.) Petitioner reported exacerbations in anxiety and depression symptoms triggered by recent onset of daytime urinary incontinence and left side pain in his neck, arm and torso. (AR 1059.) Dr. Holley discussed also the results of Dr. Gage's neuropsychological testing with Petitioner. (AR

1059.) Mental status examination revealed no pain behaviors or hand tremors, normal posture and gait, and a calm demeanor, but she noted Petitioner's thought content showed somatic preoccupation, expectation for chronic disability, and helplessness. (AR 1059-60.) Her assessment included diagnoses of posttraumatic stress disorder, "R/O Conversion Disorder or other Somatoform Condition," and histrionic traits. (AR 1060.)

On May 27, 2015, Dr. James Piktel examined Petitioner and reviewed the results of Dr. Gage's neuropsychological testing. (AR 1050.) Petitioner reported worsening sleep. Dr. Piktel remarked that, "[i]t looks like he has a hard go of it in terms of processing speed and cognitive speed but his executive functioning remains fair." (AR 1052.) Dr. Piktel's examination revealed articulate, but not coherent, speech with some latency and thought blocking; anxious mood; and fair insight and judgment. (AR 1052.) Dr. Piktel opined Adderall may assist with processing speed. His medication regimen was continued. (AR 1052.)

Petitioner was seen by Dr. Gage for a follow-up feedback session on June 8, 2015. (AR 966.) Dr. Gage's diagnosis was posttraumatic stress disorder; conversion disorder with attacks (provisional); and major depressive disorder, recurrent, and severe. (AR 966.)[7] Dr. Gage recommended continued psychotherapy, which treatment was limited due to Petitioner's finances. (AR 966.)

Whitehead-Price also examined Petitioner on June 8, 2015, and discussed

---

[7] Conversion disorder is "a mental disorder in which an unconscious emotional conflict is expressed as an alteration or loss of physical functioning, either voluntary motor or sensory." 259850 conversion disorder, STEDMANS MEDICAL DICTIONARY 259850.

Petitioner's chronic conditions. Petitioner and his wife discussed his diagnosis of conversion disorder with Whitehead-Price, along with treatment options. (AR 972.)

At his next follow-up visit on June 23, 2015, with Whitehead-Price, she indicated his current condition of "dissociative disorder or reaction, unspecified," was under fair control; and his cervical and back pain were under fair control. (AR 1218.) However, she noted Petitioner had fallen the week prior to his appointment with her and hit his head, which had increased his pain.

On June 26, 2015, Dr. Piktel examined Petitioner, noting his history of PTSD, major depressive disorder, generalized anxiety, and chronic pain in the context of a traumatic brain injury. (AR 1049.) Petitioner and his wife reported plans to travel to Salt Lake City for an extended inpatient hospitalization relating to his traumatic brain injury and possible conversion disorder. (AR 1049.) Dr. Piktel noted some thought blocking, anxious mood, and fair insight and judgment. (AR 1049-50.) Dr. Piktel's assessment and impression was cognitive disorder, not otherwise specified; posttraumatic stress disorder; and generalized anxiety disorder. Petitioner's medications were continued. (AR 1050.)

Dr. Holley saw Petitioner on June 30, 2015, for psychotherapy. (AR 1054.) Her mental status examination revealed that Petitioner presented with his therapy dog, which appeared to calm Petitioner's anxiety. (AR 1055.) Dr. Holley observed no pain behaviors or hand tremors, but noted Petitioner sweated heavily, appeared nervous, and his thought content showed ongoing somatic preoccupation, expectation for chronic disability, and helplessness. (AR 1055.) Dr. Holley's assessment included conversion disorder with

depressive symptoms, posttraumatic stress disorder, and histrionic traits. (AR 1056.) The plan was to transition Petitioner into inpatient treatment for conversion disorder. (AR 1056.)

On July 13, 2015, Petitioner suffered a ground level fall. He sought treatment at Saint Alphonsus Regional Medical Center for severe neck pain, headache, and back pain on July 14, 17, and 19, 2015. (AR 1017, 1026, 1081.) Emergency room notes from the three visits indicate that Petitioner's work-up included a CT scan of the head and neck, which revealed no acute findings. (AR 1022, 1081-84.) Petitioner reported his last seizure was six months prior, and that Dilantin had been working well for seizure management. (AR 1017.) Upon physical examination, it was noted Petitioner ambulated with a cane without difficulty, and that he experienced diffuse muscle tenderness in his back and neck, down to his shoulders bilaterally. (AR 1018.)

At a follow-up visit on July 23, 2015, Whitehead-Price noted that Petitioner had fallen the week prior and hit his head on a concrete floor, exacerbating Petitioner's pain complaints. (AR 968, 1026.).)

On July 30, 2015, Petitioner reported to Whitehead-Price that he was experiencing symptoms of fatigue, nausea, body aches, and tremors. (AR 1211.) He reported also being seizure free for six months. Whitehead-Price noted the presence of a cough, dyspnea, and chest pressure. (AR 1212-13.) She ordered laboratory tests and a chest x-ray. Chest x-rays revealed opacity within the medial right upper lobe, and White-head Price diagnosed pneumonia. (AR 1012

On August 21, 2015, Petitioner reported shortness of breath, pain when coughing, and dizziness. (AR 1205.) Whitehead-Price's physical exam notes indicated pain was reportedly at a level five out of ten on the pain scale. (AR 1205-1210.)

After no improvement of his pneumonia symptoms, Petitioner sought additional care from Joshua Holweger, M.D. On October 8, 2015, Dr. Holweger opined that Petitioner was suffering from mild persistent asthma despite normal pulmonary function tests. (AR 1245.) Dr. Holweger noted a flat affect, intermittent eye contact, and slowed thought processing. He considered that Petitioner's conversion disorder associated with traumatic brain injury could be playing a role in Petitioner's symptoms. (AR 1245.) Dr. Holweger began treatment with inhalers. At a follow-up appointment on December 10, 2015, Petitioner reported improvement in his pneumonia symptoms after using the inhalers. (AR 1247.)

Dr. Piktel ordered a psychiatric inpatient admission for symptoms of depression and attempted suicide on October 26, 2015. (AR 1108, 1117, 1146.) The Saint Alphonsus Behavioral Health Adult Multidisciplinary Team developed a treatment plan for Petitioner dated October 30 – 31, 2015. (AR 1105 – 1107.) The goals of the treatment plan were to decrease suicidal thinking, identify and utilize coping skills, and identify reasons to live and hope for the future. (AR 1107.) Petitioner was discharged on November 5, 2015. (AR 1108 – 1125.)

At his outpatient therapy follow-up visit with Dr. Holley on December 10, 2015, she recorded Petitioner's recent inpatient hospitalization. (AR 1276-77.) Dr. Holley noted

also that Petitioner walked with a cane and leaned on his wife for stability. He appeared

agitated, but did not demonstrate pain behaviors or hand tremors. Petitioner described his

mood as paranoid. (AR 1277.)

On December 11, 2015, Whitehead-Price noted Petitioner presented with anxious

and fearful thoughts and paranoia during his chronic pain management follow-up visit.

(AR 1201.) Petitioner's wife reported that, although his anxiety symptoms had improved,

he often accompanied her in the car and stayed in the car while she shopped, because he

could not stay home alone or enter the store due to his anxiety. (AR 1201.) Whitehead-

Price noted that Petitioner's gait was unstable, and he was using a cane. His right

shoulder exhibited pain with range of motion. (AR 1203.) She referred Petitioner to Sarah

DeBoard Marion, Ph.D.,[8] at Saint Alphonsus Rehabilitation Services.

Dr. Holley's progress note on January 15, 2016, recorded that Petitioner and his

wife reported regression in Petitioner's functioning over the past month. (AR 1272-73.)

Petitioner walked with the assistance of a cane. He initially appeared agitated, and

demonstrated "occasional pain behaviors in his right shoulder." (AR 1273.)[9] Dr. Holley

noted frequent hand tremors and a highly labile affect. (AR 1273.)

Petitioner established care with the Terry Reilly Behavioral Health clinic in

Nampa on January 25, 2016, where Dr. Jonathan Bowman assumed psychiatric care and

---

[8] The ALJ's written determination and the parties' briefing refers to Dr. Marion as Dr. DeBoard. Accordingly, the Court will refer to her as Dr. DeBoard to avoid confusion.

[9] Dr. Holley did not describe the pain behaviors she observed. However, during a prior visit, she described him as rubbing his right shoulder constantly. (AR 1262.)

treatment of Petitioner, and Ann Marie Reed, PNP, provided medication management. (AR 1280.) Dr. Bowman recorded that Petitioner "is clearly impaired and should qualify for SSD no problem." (AR 1280.) Dr. Bowman noted the need for comprehensive management, together with Drs. Redshaw and Holley, of Petitioner's chronic pain, psychiatric disfunction secondary to traumatic injury to his brain, and seizure disorder. (AR 1280-81.) Physical examination that date found Petitioner appeared "clearly impaired. Sits quietly with head down initially. Wife does most talking. When interviewed, he gets frustrated easily. Difficulty finding words. Difficulty remembering." (AR 1283.) Based upon the Petitioner's answers to the depression index assessment, suicide risk was noted as high. (AR 1285.)

Dr. DeBoard examined Petitioner on January 27, 2016, for a neuropsychological consultation at the request of Whitehead-Price. (AR 1222.) Diagnoses were noted as conversion disorder with sensory symptom or deficit, posttraumatic stress disorder, and major depressive disorder. She reviewed Dr. Redshaw's treatment notes, which indicated Petitioner's symptoms were consistent with nonepileptic seizure and conversion disorder, and Dr. Gage's November 2015 neuropsychological evaluation. (AR 1222.) From her perspective, she was of the opinion that Petitioner's psychological difficulties "are prominent," and that he may benefit from occupational therapy. (AR 1223.)

On February 15, 2016, Petitioner sought care for shoulder pain from Whitehead-Price. (AR 1197.) Petitioner reported worsening right shoulder pain, aggravated by range of motion. He also reported worsening mental health symptoms, with increased episodes

of absence type seizure activity and worsening memory. (AR 1197.)

Lisa Lawrence, PMHNP, a practitioner at Terry Reilly Behavioral Health, performed a comprehensive psychiatric intake examination on February 16, 2016. (AR 1286.) She noted that Petitioner reported a great deal of trauma in his life, and that "it is hard to tell what is exaggerated…but he has had extensive neuro psychiatric testing" by Dr. Gage. She had not yet reviewed the records. (AR 1288.) Accordingly, Lawrence noted she would continue to use his present diagnosis of conversion disorder, which "appears to be correct," and continue with his medications. (AR 1288.) Additional problems were noted as posttraumatic stress disorder, night terrors, generalized anxiety disorder, insomnia, chronic pain, seizure disorder, and late effect of traumatic injury to the brain. (AR 1889.) Upon examination, Petitioner's speech exhibited difficulty with word finding, impaired cognition and attention, but he exhibited a normal gait, absence of psychomotor agitation, and no tremors. (AR 1290.)

Dr. Holley's progress note dated February 23, 2016, indicated Petitioner ambulated with a cane, and he was accompanied by his service dog. (AR 1268-69.) She noted he was animated and talkative, with psychomotor agitation, and she observed tremor in the right hand, constant fidgeting, and repositioning. However, she noted he exhibited no pain behaviors. Petitioner reported his mood was "a little better." (AR 1269.)

On March 8, 2016, Petitioner began occupational therapy at Saint Alphonsus Rehabilitation Services. (AR 1146.) Dr. DeBoard had referred Petitioner to occupational

therapy for cognitive treatment and to facilitate increased physical function. Upon intake, his diagnoses were listed as mild cognitive impairment and conversion disorder with sensory symptom or deficit. Notes indicate that, at that time, Petitioner was independent in basic care with increased time, but unable to work secondary to disfunction. (AR 1146.) Pain was noted as a seven out of ten in his cervical and thoracic spine area, and a three out of ten in his lumbar spine area. Petitioner reported symptoms of whole-body pain, decreased cognitive skills, fatigue, and generalized weakness. Treatment notes documented his past history of an accident in 2008, multiple concussions occurring in 2013, and a hospitalization in 2015 for attempted suicide.

Kimberly Hendrickson's occupational therapy intake assessment recommended Petitioner participate in skilled occupational therapy in conjunction with a home exercise program to address his cognitive and physical limitations, which included anxiety, depression, and speech/language delays. (AR 1148.) The goals for occupational therapy were to have Petitioner practice and be able to complete three activities of daily living independently, such as basic meal preparation, washing dishes, doing laundry, and light cleaning. (AR 1148.) Hendrickson recommended continuing occupational therapy twice per week with an expected duration of twelve weeks. (AR 1148.) Petitioner thereafter participated in occupational therapy sessions at the recommended duration with Brenda Yoder, P.T., and Kim Hendrickson.

On March 10, 2016, Petitioner saw Whitehead-Price for a follow-up appointment. (AR 1192.) She noted that Petitioner's baseline delay in speech was stable, and his pain

level was at seven out of ten. (AR 1194.) Petitioner's urine drug screen revealed he was taking medications (amphetamines and opiates) as prescribed. (AR 1195.)

On March 12, 2016, Terry Reilly provider Ann Marie Reed, PNP, saw Petitioner for an office visit for psychiatric medication management. (AR 1292.) She noted that Petitioner's mood appeared anxious, and his cognition and attention showed distractibility and poor concentration. (AR 1292.)

Dr. Holley's progress note dated March 23, 2016, indicated Petitioner and his wife reported improvement in Petitioner's functioning, attributable to occupational therapy. (AR 1266.) Petitioner reported only one conversion seizure episode the prior month, and significant gains in balance. (AR 1266.) Dr. Holley's examination notes reflect that Petitioner ambulated independently and exhibited no pain behaviors, but that Dr. Holley observed mild bilateral hand tremors, and constant fidgeting. Petitioner's affect appeared nervous, and his thought content showed ongoing somatic and trauma preoccupations. (AR 1266.)

Dr. DeBoard's progress note dated March 31, 2016, recorded Petitioner was attending occupational therapy and balance therapy. (AR 1224.) Dr. DeBoard opined Petitioner was making strides in terms of being more independent. She observed also Petitioner appeared more talkative, and was ambulating without a walker. (AR 1224.) She noted Petitioner continued to experience significant hypervigilance, and posttraumatic stress symptoms with difficulty functioning. (AR 1224.)

Anne Marie Reed, PNP, examined petitioner on April 6, 2016, for psychiatric

medication management. (AR 1297.) Upon examination, his mood and affect appeared appropriate, he walked with a normal gait, and he had an absence of psychomotor agitation and tremors. (AR 1298.)

On April 25, 2016, Whitehead-Price examined Petitioner and discussed possible shoulder surgery and further pain management. (AR 1187.) Upon examination, Whitehead-Price noted the absence of speech delays, but no improvement of pain symptoms in Petitioner's right shoulder, and a "shuffle gait with back and neck pain." (AR 1190.)

At a medication management visit at Terry Reilly with Amanda Stewart, PMHNP, on May 5, 2016, Petitioner was accompanied by his wife. Stewart reported Petitioner's mood appeared cooperative and calm, with a normal speech rate and rhythm. (AR 1302.) His motor activity showed normal gait, absence of psychomotor agitation, and no tremors. (AR 1303.) Stewart authorized refills of his regularly prescribed medications. (AR 1304 – 1305.) Petitioner had another medication management visit with PNP Reed on May 16, 2016, where he reported feeling "off" and that his nightmares had increased. (AR 1306.) Reed's mental status exam notes indicate Petitioner's mood appeared depressed, but that he exhibited appropriate cognitive abilities and normal gait, no tremors, and no psychomotor agitation. (AR 1306.)

A progress note from Dr. Holley dated May 17, 2016, reveals independent ambulation, highly animated and talkative behavior, no observed hand tremors, and pain behavior with regard to his right shoulder. (AR 1262.) Petitioner's affect was nervous,

and his thought content exhibited ongoing somatic preoccupation. (AR 1262.)

Petitioner was discharged from occupational therapy on May 20, 2016. (AR 1146

– 1182.) Upon discharge, Hendrickson's assessment was that Petitioner exhibited good

progress and benefitted from skilled rehabilitative therapy with a home exercise program.

Functional gains included an increased daily routine and time out of bed, participation in

functional activities of daily living, including independence in the same by utilizing

cognitive compensatory strategies, symptom management, and resolution of visual

deficits by implementation of neuro visual postural therapy. (AR 1157, 1181.)

Hendrickson reported that his functional limitations were "20% to less than 40%

impaired." (AR 1181.)

At his next office visit with Terry Reilly provider Camille Buchmiller, PAC, on

May 21, 2016, Petitioner sought treatment for pain management. (AR 1307.) Buchmiller

noted that, upon examination, Petitioner had trouble with his speech, difficulty

remembering, and was able to answer questions only with his wife's encouragement. (AR

1314.) Buchmiller referred him to a pain management specialist. (AR 1314.)

Dr. DeBoard's progress note dated May 25, 2016, noted Petitioner had received

tremendous benefit from occupational therapy, which had improved his functioning. (AR

1226.) She also noted his mental status was improved, although he continued to exhibit

speech and language difficulties. (AR 1226.) A later progress note by Dr. DeBoard dated

June 8, 2016, indicated Petitioner reported increased anxiety and exacerbation in his

posttraumatic stress disorder symptoms upon a disruption in his medical treatment

regimen. (AR 1228.)

Whitehead-Price saw Petitioner on June 7, 2016, to discuss an orthopedic referral. (AR 1183.) At that visit, Petitioner reported his right shoulder pain was worsening, even after receiving a cortisone injection from Dr. Holley, which resulted in a pruritic rash. (AR 1183.) Whitehead-Price observed right arm guarding. (AR 1185.)

On June 15, 2016, Petitioner had a follow-up visit for medication management with PNP Reed at Terry Reilly Behavioral Health. (AR 1316.) He complained of increased symptoms of anxiety, sleep difficulties secondary to chronic pain, and nightmares. Reed noted Petitioner's mood appeared tearful, apathetic, and restricted. (AR 1317.) He exhibited poor eye contact and was withdrawn, while his cognition showed distractibility, poor concentration, and impaired judgment. (AR 1317.)

At a final visit with Dr. DeBoard on July 1, 2016, Petitioner reported feeling as if he was sliding backward due to difficulties with pain control and re-establishing care with a pain clinic. Dr. DeBoard's opinion was that Petitioner was not drug seeking, and that rehabilitation services had assisted with increased functionality. (AR 1230.)

On July 13, 2016, at an office visit with PNP Reed, Petitioner reported being in pain, with symptoms of depression, stress, and anxiety. (AR 1321.) Reed's mental status examination notes indicate that Petitioner's mood appeared calm, his gait appeared normal, and he exhibited no psychomotor agitation or tremors. (AR 1322.) He reported increased pain at his next office visit on August 8, 2016, and reported experiencing more "brain attacks" since the last visit. (AR 1327.) Reed's mental status exam recorded a

depressed and pessimistic mood. (AR 1328.)

Petitioner underwent a sleep study on July 18, 2016, which revealed "markedly severe fragmentation of sleep with combination of respiratory events and leg movements with concern for underestimation of the degree of sleep-disordered breathing." (AR 1239.) He had a reduced sleep deficiency and significant worsening of sleep disordered breathing noted in REM sleep. (AR 1239.)

Dr. Holley treated Petitioner on August 15, 2016, for psychiatric follow-up. Petitioner reported an increase in emotional disturbances upon the death of a friend. (AR 1257-58.) Dr. Holley's examination findings indicated Petitioner ambulated independently, exhibited no pain behaviors or hand tremors, and he displayed a somber affect with ongoing somatic preoccupation. (AR 1258.)

At a follow up visit with the sleep study clinic on August 16, 2016, the results of Petitioner's sleep study were reviewed. (AR 1250-51.) Petitioner reported using a CPAP machine borrowed from a friend. (AR 1250.) Periodic limb movement disorder was diagnosed based upon the sleep study. (AR 1251.) He was also diagnosed with mild obstructive sleep apnea, but the clinician noted that sleep fragmentation was markedly severe with comminution respiratory events and leg movements. (AR 1250.) The plan was to continue with use of the CPAP machine, but if Petitioner continued to have fragmented, nonrestorative sleep, additional treatment would consist of pharmacologic suppression of leg movements. (AR 1251.)

PNP Reed saw Petitioner on August 31, 2016, noting Petitioner's chief complaint

was that he was "wobbly and in pain." (AR 1331.) Reed noted Petitioner was regressing, becoming more forgetful and less motivated. His wife reported Petitioner was unable to follow through on tasks and plans. Reed's mental status examination notes indicate a depressed and tearful mood, distractibility and poor concentration, but otherwise appropriate behavior. (AR 1331.)

Dr. Holley saw Petitioner on September 15, 2016, for a psychiatric follow up. Dr. Holley's mental status examination noted Petitioner was present with his service dog, he exhibited independent ambulation, pain behaviors alluding to his right shoulder, and no hand tremors. His thought content showed ongoing somatic preoccupation. (AR 1255.)

On September 27, 2016, PNP Reed's assessment indicated Petitioner continued to have trouble with sleep and had regressed in his coping ability since becoming homeless. (AR 1340.) Petitioner exhibited marked anxiety, which triggered more forgetfulness. (*Id*.)

Dr. Holley saw Petitioner next on November 7, 2016. (AR 1475.) Petitioner reported having spent one month in Las Vegas, networking with friends for lodging and trying to establish medical care. Petitioner reported feeling optimistic, and planning to enroll in a TBI/conversion disorder treatment program at the Cleveland Clinic. Dr. Holley's mental status examination notes indicate Petitioner ambulated with the use of a cane and demonstrated no pain behaviors, but he exhibited bilateral hand tremors when he checked his cell phone. She noted his thought content showed less somatic preoccupation and more hopeful expectations. (AR 1476.)

PNP Reed saw Petitioner again on November 9, 2016, for medication

management. (AR 1410.) Petitioner reported feeling "stressed," as he and his wife had slept in their truck for several nights, and were planning to return to Las Vegas to help friends. (AR 1410.) Petitioner reported being more dependent upon his wife for care. She was managing his activities of daily living, helping him with food, and dressing him. (AR 1410.) Reed's mental status examination results indicate Petitioner's mood was depressed, tearful, and apathetic. He exhibited poor eye contact, appeared withdrawn, and exhibited distractibility and poor concentration. (AR 1410.) Reed noted Petitioner's anxiety was triggering increased forgetfulness, and symptoms of poor articulation, weakness, and paralysis. (AR 1413.)

Petitioner continued treatment on a monthly basis at Terry Reilly Behavioral Health in 2017 with Ann Marie Reed, PNP. (AR 1369.) On January 18, 2017, Petitioner's wife reported her husband was offered a job in Nevada offering tactical defense training, but Petitioner did not think he could obtain a firearms license or compete in mixed martial arts. (AR 1403.) He reported also that the vocational specialist did not believe he could work full time. (AR 1403.) Reed's mental status examination revealed Petitioner presented wearing dark sunglasses and a stocking cap pulled over his face. (AR 1403.) His mood was stressed, affect was flat, and he ambulated with a cane. (AR 1404.)

Reed's progress notes dated February 1, February 17, March 15, and April 10, 2017, indicated Petitioner's wife reported he was "better," as the Adderall prevented him from rambling as much, and he was more focused and productive, performing tasks such as assisting with the dog, showering alone, and coloring. (AR 1369, 1379, 1386, 1391.)

At each visit, Petitioner reportedly presented with dark sunglasses and a stocking cap pulled over his face. He made limited eye contact, had a flat affect, stressed mood, and halting, slow speech. (AR 1370, 1379, 1386, 1392.) His gait was assisted with the use of a cane. (AR 1370, 1379, 1386, 1392.) He reportedly fell in the snow in January of 2017. (AR 1392.)

Because of the fall and resulting increase in pain, Petitioner was referred to Rochelle Lynam, PA-C, at Terry Reilly's clinic, for physical therapy on January 20, 2017. (AR 1397.) He reportedly had two falls over the past five days, one outside on the ice, and again in the shower. A second physical therapy evaluation was conducted by Madeline Connley, PA-C, on February 21, 2017. (AR 1426.) She recommended physical therapy to address Petitioner's complaints of pain.

Petitioner participated in physical therapy with Connley beginning on February 21, 2017. (AR 1428.) She anticipated a lengthy process. (AR 1428.) Medical records indicate Petitioner attended physical therapy on February 24, February 28, March 2, March 7, March 14, March 28, March 29, March 31, April 6, and April 24, 2017. (AR 1429-1454.) He participated in strengthening exercises and aquatic therapy. Notably, Connley reported no change in his condition, and that she did not believe Petitioner had any interest in returning to any degree of work. (AR 1447.)

Petitioner followed up with Dr. Holley on January 24 and February 28, 2017. (AR 1468, 1471.) At the January visit, Dr. Holley declined to provide a mental residual functional capacity evaluation, because she had referred Petitioner to various pain

specialists and her role had become limited to pain consultation. (AR 1472.) She did, however, document his current level of functioning, noting Petitioner had decreased function, required assistance with driving, spent his time sleeping, and had ceased helpful coping behaviors such as meditating, coloring, or walking his dog. (AR 1472.) Consequently, she noted Petitioner had become more unstable in his gait, and had been mumbling a lot, with his wife reporting difficulty understanding him. (AR 1472.) She noted that Petitioner and his wife planned to move back to Las Vegas, and that they were currently living with her parents. (AR 1469.) Dr. Holley's mental health status examination noted Petitioner ambulated with the use of a cane, exhibited a slow and unsteady gait, and pain behaviors with regard to his right shoulder and the left side of his neck. (AR69.) She noted also that his thought content displayed sustained regression in somatic preoccupation, self-critical themes, and worry. (AR 1469.)

On March 7, 2017, Dr. DeBoard conducted an evaluation. (AR 1455.) Her assessment recommended a second course of occupational therapy to address memory, balance, and word finding issues. (AR 1455.) She noted that Petitioner previously responded well to a functional approach. (AR 1462.) Occupational therapist Amanda Craig began providing services to Petitioner on March 7, 2017. (AR 1457.) On March 17, 2017, Petitioner reported being able to feed his dog. (AR 1458.) On March 30, 2017, Petitioner reportedly responded well to all activities during occupational therapy, although he lost his balance four times during the session that day. (AR 1459.) On April 11, 2017, Craig noted Petitioner demonstrated fatigue, and required rest during the

session, but otherwise performed well. (AR 1460.) On April 25, 2017, Petitioner reported having fallen and he required assistance to stand. (AR 1461.) Craig indicated Petitioner was responsive to treatment but required verbal reminders to pace himself. (AR 1461.)

On May 9, 2017, Petitioner and his wife reported to Ann Marie Reed that they believed the occupational therapy treatments were helpful. (AR 1479.) There are no further medical records in the administrative record.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantial gainful activity. The ALJ found Petitioner had not engaged in substantial gainful activity after his amended onset date of April 1, 2013. At step two, it must be determined whether the claimant suffers from a severe impairment. The ALJ found Petitioner's degenerative disc disease, mild obstructive sleep apnea (with markedly severe sleep fragmentation, comminution respiratory events and leg movements), seizures related to conversion disorder, depression, anxiety, posttraumatic stress disorder, histrionic personality disorder, and neurocognitive disorders severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found that Petitioner's impairments did not meet or equal the criteria for any listed impairments. The ALJ considered Listing section 1.04 (Spine Disorders), Listing section 11.02 (Epilepsy), and Listing sections 12.02 (Neurocognitive

Disorders), 12.04 (Depressive, Bipolar and Other Disorders), 12.06 (Anxiety and Obsessive-Compulsive Control Disorders), and 12.15 (Trauma-and Stressor-Related Disorders). If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity (RFC) and next determine, at step four, whether the claimant has demonstrated an inability to perform past relevant work.

The ALJ determined Petitioner retained the RFC to perform light work as defined by 20 C.F.R. § 404.1567(b), with limitations. He found Petitioner could stand and/or walk for six hours and sit for six hours per day, provided he had the ability to alternate between these three positions every thirty minutes, and use a cane while standing or walking; occasionally climb ramps or stairs, but only to enter the workplace; occasionally stoop or kneel; and never climb ropes, ladders or scaffolds, balance, crouch, crawl, work at unprotected heights or around moving mechanical parts, or operate a motor vehicle as part of his employment. The ALJ found also that Petitioner should have less than occasional exposure to vibration, may be off-task 5% of an eight-hour workday in addition to normal work breaks, and be absent from work one day each month. The ALJ determined that Petitioner could push, pull, lift, or carry twenty pounds occasionally and ten pounds frequently.

In determining Petitioner's RFC, the ALJ found that Petitioner's impairments could reasonably be expected to cause the symptoms he alleged, but that he has the above residual functional capacity because his conditions are amendable to treatment, and his condition could be further improved with intensive psychotherapy. (AR 29.) The ALJ

reviewed the medical opinion evidence, and discounted all of the opinions of Petitioner's treating physicians and other medical care providers. Instead, the ALJ assigned significant weight to the consulting psychologist, Dawn Crosson, Psy.D., who testified at the June 20, 2017 hearing; some weight to the consulting psychologist, Ronald Houston, Ph.D., who testified at the November 10, 2016 hearing; and some weight to the opinions of Drs. Michael O'Brien and Barry Cusack, the state agency reviewing physicians assessing Petitioner's physical limitations. The ALJ rejected multiple opinions from seven treating sources in doing so.

At step four, the ALJ found Petitioner was not able to perform his past relevant work. At step five, the ALJ found Petitioner was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, such as routing clerk, router, and fruit distributor. According, the ALJ determined Petitioner was not disabled.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he not only cannot do her previous work but is

unable, considering his age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the Petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its]

judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

When reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

## DISCUSSION

Petitioner argues the ALJ erred at step four by failing to properly evaluate the medical opinion evidence, and by failing to include all of Petitioner's medically determinable impairments in the RFC determination. Here, Petitioner submitted nine opinions from seven different treating sources, all of which the ALJ rejected. Instead, the ALJ gave significant weight to the consulting psychologist, Dawn Crosson, who testified at the hearing. Petitioner argues that, for each rejected opinion, the ALJ failed to give either specific and legitimate, or germane, reasons supported by substantial evidence in the record. As for the RFC determination, Petitioner contends the ALJ did not consider evidence in the record supporting Petitioner's impaired ability to reach, finger, and handle, as well as the medical source opinions indicating Petitioner would miss more than

two days of work each month. Petitioner asks the Court to remand the ALJ's decision for further consideration.

1.      **Whether the ALJ Improperly Weighed the Medical Opinion Evidence[10]**

In social security cases, there are three types of medical opinions: "those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r*, 574 F.3d 685, 692 (9th Cir. 2009) (citation omitted). "The medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also* SSR 96-2P, 1996 WL 374188, at *1 (S.S.A. July 2, 1996) (stating that a well-supported opinion by a treating source which is not inconsistent with other substantial evidence in the case record "must be given controlling weight; i.e. it must be adopted.").

ALJs generally give more weight to medical opinions from treating physicians, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations...." 20 C.F.R. §§

---

[10] The Social Security Administration recently revised its criteria for evaluating medical opinion evidence. For claims filed before March 27, 2017, the rules in 20 C.F.R. § 404.1527 apply. Petitioner's claim was filed on August 4, 2014. The regulation differentiates between acceptable medical sources, defined as licensed physicians and certain other qualified specialists, 20 C.F.R. § 404.1513(a), and nonmedical sources, such as physician assistants.

404.1527(c)(2), 416.927(c)(2). Thus, the opinion of a treating source is generally given more weight than the opinion of a doctor who does not treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Should the ALJ decide not to give a treating physician's medical opinion controlling weight, the ALJ must weigh it according to factors such as the nature, extent, and length of the physician-patient relationship, the frequency of evaluations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician. *Trevizo*, 871 F.3d at 676; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Although a "treating physician's opinion is entitled to 'substantial weight,'" *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (citation omitted), it is "not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Rather, an ALJ may reject the uncontradicted opinion of a treating physician by stating "clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citation omitted); *see also* SSR 96-2P, 1996 WL 374188 at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons

for that weight."). However, "[t]he ALJ need not accept the opinion of any physician,

including a treating physician, if that opinion is brief, conclusory, and inadequately

supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

Nonmedical or other source opinions are not entitled to the same deference as

acceptable medical source opinions. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir.

2012) (citing 20 C.F.R. § 404.1527; SSR 06-03p). Other sources include nurse

practitioners, physical therapists, occupational therapists, licensed practical nurses (LPN),

and registered nurses (RN). *See* 20 C.F.R. § 416.913(a) (defining acceptable medical

sources as licensed physicians, psychologists, optometrists, and podiatrists). The ALJ

may discount testimony from "other sources" if the ALJ "'gives reasons germane to each

witness for doing so,'" supported by substantial evidence in the record. *Id.*

### A. *Kelly Whitehead-Price, NP-C*

Whitehead-Price, a certified nurse practitioner, began treating Petitioner on

September 5, 2014. On January 5, 2015, she completed a physical residual functional

capacity questionnaire, in which she opined Petitioner would be limited to less than

sedentary work, require unscheduled breaks every thirty minutes, and that he would be

absent more than four times each month. (AR 896-899.) Her opinions were based upon

Petitioner's diagnosis of lumbar spinal stenosis, PTSD, traumatic brain injury, and

seizure disorder, which caused chronic pain, seizures, and anxiety. (AR 896.) She

indicated also that, in forming her opinions, she relied upon her direct observation;

physical examination; consultation with other providers; historical medical records; counseling and therapy records; imaging studies; laboratory results; and her own experience and background. (AR 898.)

Whitehead-Price provided a second opinion dated May 4, 2016. (AR 1143-1145.) She again opined Petitioner was not capable of even low stress work due to his PTSD, somatization, and conversion disorder. (AR 1145.) She explained also that Petitioner's chronic neck, thoracic, and low back pain resulted in an inability to maintain one position for long periods of time. (AR 1145.) She indicated Petitioner would need to use a cane throughout the day due to balance problems, dizziness, pain and weakness. (AR 1144.)

The ALJ discounted the majority of Whitehead-Price's opinions, because they were inconsistent with Petitioner's "normal brain MRI findings, his normal EEG findings, normal nerve conduction test findings, mild spine degeneration findings, and Petitioner's testimony that he must alternate positions every thirty minutes." The ALJ gave her opinions "little weight overall." Nonetheless, he gave her opinion that Petitioner must use a cane significant weight, because that assessment was reasonably consistent with Petitioner's medical records over time showing treatment for fall injuries and balance difficulties. (AR 27.)

Petitioner argues the ALJ failed to acknowledge substantial evidence in the record supporting Whitehead-Price's opinions. The Court concurs, and finds, for the reasons that follow, that the ALJ did not provide germane reasons supported by substantial evidence in the record for giving Whitehead-Price's opinion little weight. First, Petitioner's EEG

was not normal. It showed right central parietal dysrhythmia at the C4/P4 region of his brain. (AR 814, 846.) An ambulatory 48-hour EEG study ordered by Dr. Redshaw documented one clinical event with a total of three combined push button events, consistent with a nonepileptic event and with a diagnosis of conversion disorder or somatoform disorder. The ALJ did not acknowledge these abnormal test results in his analysis.

The ALJ's conclusion ignores also Dr. Gage's neuropsychological evaluation, finalized on June 8, 2015, which objectively showed cognitive deficiencies in processing speed, delays in verbal memory and recall, and poor fine motor dexterity. Dr. Gage's results were reviewed by Whitehead-Price, and Drs. Piktel, Holley, and DeBoard, all of whom appeared to concur in the results based upon their own independent observations. For instance, Dr. Piktel noted on May 27, 2015, that Petitioner exhibited articulate, but not coherent, speech with some latency and thought blocking. Dr. Piktel noted the same on June 26, 2015. And, Dr. DeBoard opined Petitioner's psychological difficulties were prominent, recommending occupational therapy.

Further, the ALJ did not acknowledge that none of Petitioner's treating physicians discounted Petitioner's mental health symptom testimony or its origins. Based upon several traumatic events throughout his childhood and multiple head injuries, and his presentation at office visits, all of Petitioner's medical care providers, including Whitehead-Price, were of the opinion that Petitioner's cognitive impairments and symptoms of depression, anxiety, and posttraumatic stress disorder manifested

themselves in noticeable ways, such as impaired memory, delayed speech, hand tremors, difficulty balancing, inability to concentrate, hypervigilance, and irritability.

Second, the ALJ failed to acknowledge the longitudinal history of Petitioner's treatment for pain in his cervical, thoracic, and lumbar spine, with radicular symptoms, which dates back to 2010 and continued throughout 2017. MRI results in March of 2014 showed progressive worsening of Petitioner's pain due to spondylitic ridging at the C6-C7 level, resulting in mild canal stenosis and mild to moderate bilateral foraminal stenosis with possible mass effect on the existing bilateral C7 roots. The ALJ noted these MRI results in his written determination (AR 23), but failed to discuss their significance in the context of Whitehead-Price's opinion.

A later examination on April 17, 2014, revealed decreased sensation and numbness on the left side of Petitioner's body from his neck to his lower extremities. (AR 939.) In November of 2014, Petitioner received trigger point injections for pain control from Dr. Patrick Farrell. He was prescribed opiates for pain management. He received a cortisone injection in 2016 from Dr. Holley for worsening pain in his right shoulder. Petitioner underwent physical therapy to address his pain. And, over a course of several years, he consistently complained to various medical care providers of pain that radiated into the bilateral upper trapezius and scapular area, pain in his thoracic spine that radiated into has bilateral thoracic area, and axial low back pain extending to his right leg and foot. (*See*, e.g., AR 1126.)

Last, a review of Petitioner's testimony during the hearings on November 10,

2016, and June 20, 2017, does not support the ALJ's conclusion that Petitioner testified he must alternate positions every thirty minutes during the course of a normal day. (*See* AR 59 – 64.) Instead, Petitioner testified that, if he had a sedentary job, he would have a hard time sitting for more than thirty minutes because sitting puts pressure on his lower spine, so he would "have to stand up and move around a lot." (AR 71.) As for walking, he testified that, at most, he could stand and walk for about thirty minutes before he would have to sit again. (AR 72.) He testified, however, that he sometimes loses his balance while walking, and he has difficulty walking due to pain. (AR 71-73.) He did not testify he could sit, walk, and stand on a sustained basis for an eight-hour work day over the course of a forty-hour work week.

Notably, the ALJ's reasoning ignores Petitioner's testimony about his good days and his bad days, as well as his cognitive functioning and its effect on sustained work. He testified that sometimes he forgets whole days. (AR 87.) His wife writes out lists of tasks for him to do every day, pre-bags the dog's food for the day, and sometimes helps Petitioner use the toilet and shower. (AR 59 – 62.) He also uses meditation techniques taught to him during his occupational therapy sessions to "reset" so that he can function. (AR 62.) Petitioner's testimony about the most he could sit or stand does not account for Petitioner's limited actual daily activities.

Thus, only a myopic view of one portion of Petitioner's testimony about standing and walking supports the ALJ's reason for rejecting Whitehead-Price's opinion. But, a longitudinal review, considering the evidence as a whole, does not. The ALJ failed to

recognize that Whitehead-Price's opinions were based upon significant experience with Petitioner and were supported by numerous medical records, not only her own but those of other treating providers. Nor did the ALJ evaluate Petitioner's medical records for internal consistency which, as noted above, disclosed consistent reports of significant cervical, thoracic, and lumbar pain with radicular symptoms, as well as consistent reports and observations of cognitive disfunction.

The Court concludes the ALJ failed to provide germane reasons supported by substantial evidence in the record for rejecting the opinions of Kelly Whitehead-Price, NP-C. Substantial evidence does not support the three reasons the ALJ gave for rejecting Whitehead-Price's opinion concerning Petitioner's inability to function at a sustained level for eight hours each day during a forty-hour workweek. Accordingly, the Court concludes the ALJ erred in rejecting Whitehead-Price's opinion.

### B.    Hellen Holley, Ph.D.

Dr. Holley treated Petitioner beginning March 27, 2014. After six visits, she completed a residual functional capacity assessment on January 23, 2015. (AR 915 - 917.) Dr. Holley lists Petitioner's primary diagnosis as posttraumatic stress disorder. In her opinion, Petitioner had marked limitations in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, and maintain regular attendance. She explained her answers were based upon Petitioner's description of absence seizures. (AR 915.) Dr. Holley indicated also Petitioner had marked limitations in his ability to complete a normal workday and a

normal workweek without interruptions from psychologically based symptoms, and would miss work four or more days each month due to psychological impairments. She explained her answers on the RFC assessment, indicating she based them upon her observation of Petitioner's fluctuating mood, limited attention span, and a disparity in his ability to concentrate from one appointment to the next. (AR 916.)

Dr. Holley explained also that Petitioner had moderate limitations in his ability to interact appropriately with the general public, and marked limitation in his ability to accept instructions, because Petitioner would become reclusive and overwhelmed, suffered from hypervigilance, and was easily angered. She noted Petitioner appeared to rely upon the constant support of his wife and family, and thus he had marked limitations in his ability to set realistic goals or make plans independently of others. (AR 916.) She explained Petitioner was highly dependent on pain and psychiatric medications, and had become agitated, paranoid and somewhat manic at least once during the six months prior to her completion of the RFC assessment, due to the combination of pain killers and anxiety medications. (AR 917.) Dr. Holley indicated she based her opinions upon her direct observation, psychological evaluation, counseling records, patient self-reports, and imaging studies. (AR 917.)

Petitioner and his wife asked Dr. Holley to complete a mental residual functional capacity assessment on January 24, 2017, but she declined to do so because, at that time, she had referred Petitioner to various specialists, and her role was limited to providing pain consultative services. Because Petitioner was no longer engaged in pain

management treatment with providers in her practice group, she served only to coordinate his referrals to other resources and help calm his cognitive, emotional, and behavioral reactions to stressors. She therefore declined to provide a second mental residual functional capacity assessment, but she did provide a narrative at that time about Petitioner's current level of functioning. (AR 1472.)

The ALJ gave Dr. Holley's opinions "little weight" for four reasons: (1) Petitioner's presentation at the two administrative hearings was not consistent with Dr. Holley's opinions, especially "the anger/confrontational aspects"; (2) she failed to assess light, moderate, or extreme in terms of severity for any of the limitations on the form she completed, and did not explain the basis for each limitation; (3) she indicated Petitioner had marked and moderate limitations for only one month or two and that some of his symptoms were related to medication, which she did not indicate was unamendable to adjustment; and (4) she declined to complete another mental residual functional capacity assessment for Petitioner in 2017. (AR 26.)

Petitioner contends that the ALJ did not offer specific, legitimate reasons supported by substantial evidence in the record for giving Dr. Holley's opinions little weight. The Court agrees. None of the reasons offered by the ALJ comports with the criteria used to evaluate medical opinions set forth in 20 C.F.R. § 404.1527(c), which requires the ALJ to consider the examining relationship, treatment relationship, length of treatment relationship, frequency of examination, supportability, consistency, and specialization.

Here, Dr. Holley had six visits with Petitioner over the course of seven months within which to form her opinions. She indicated also that she reviewed Petitioner's medical history and the reports of other specialists to whom she referred Petitioner for medical treatment. Her opinions are consistent with those of Whitehead-Price, and every other treating provider who examined Petitioner, including those who submitted residual functional capacity assessments for the ALJ's consideration. In other words, Dr. Holley's assessment was not inconsistent with the substantial evidence in the record, including her own records and those of other treating providers. When viewed in its entirety, the record provides ample support for Dr. Holley's opinions. The record contains numerous reports from Petitioner's health care providers, as well as results from objective medical tests, noted previously, that support the opinions expressed in the questionnaire Dr. Holley completed.

The ALJ's reason for rejecting Dr. Holley's opinions based upon her failure to explain the basis for each limitation is similarly not supported. Dr. Holley did not simply check boxes. At the conclusion of each section of the form, she provided explanations for the limitations she identified. Further, she indicated her opinions were based upon her observation, evaluations, and therapy records over the course of seven months. The ALJ's reason for rejecting Dr. Holley's opinions – that they were not explained – is neither accurate nor supported by the record, because explanations were given within the context of the questions on the form.

The ALJ's personal observations of Petitioner during two hearings is insufficient

to provide a basis for discounting Dr. Holley's opinions. While the inclusion of the ALJ's personal observations does not render the decision improper per se, *Nyman v. Heckler,* 779 F.2d 528, 531 (9th Cir. 1985), generally such personal observations are utilized as a reason to discredit the Petitioner, not the opinions of his treating physician. *See, e.g., Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (ALJ's personal observations, coupled with specific findings supported by the record, was a specific and legitimate reason that undermined the petitioner's credibility).

As a treating physician, Dr. Holley had a greater opportunity than that of the ALJ to know and observe Petitioner over the course of several months. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). In contrast, the ALJ's observations occurred during two discrete administrative hearings. Dr. Holley explained that her opinion Petitioner had marked ability to accept instructions and respond appropriately to criticism was supported by her observation that Petitioner became hypervigilant and easily angered/confrontational with others, and that his medication could also cause agitation, paranoia, and mania. (AR 916-17.) The ALJ's observation of Petitioner during a setting that did not involve accepting instructions and responding to criticism over the course of a work day or work week is not responsive to Dr. Holley's opinion regarding Petitioner's ability to sustain appropriate demeanor in a work setting.

The ALJ's last reason for giving Dr. Holley's opinion little weight is similarly not legitimate. Dr. Holley's reason for declining to complete a mental residual functional capacity assessment for Petitioner in 2017 was because she was no longer providing

supportive psychotherapy—other practitioners were doing so. She did not decline to provide an assessment for reasons such as malingering, or other behaviors suggesting Petitioner may have been less than honest. If Dr. Holley had declined to provide an assessment for reasons other than the fact she no longer provided mental health treatment to Petitioner, the Court could support the ALJ's rationale for giving Dr. Holley's opinions little weight. However, based upon the entirety of the record before the Court, Dr. Holley's decision not to provide such an assessment when others were more directly involved in providing psychotherapy services to Petitioner at that time does not constitute a specific or legitimate reason to discredit Dr. Holley's earlier opinion, which was based upon her treatment of him over the course of seven months. Further, the ALJ ignores the note wherein Dr. Holley provided a comprehensive review of Petitioner's level of functioning in lieu of a formal mental residual capacity assessment.

Based on the above, the Court finds the ALJ erred in giving the opinions of Dr. Holley little weight. The ALJ's determination was based upon reasons that are not supported by the record as a whole, and does not comport with the criteria for evaluating medical opinion evidence.

## C. Brenda Yoder, PT, and Kim Hendrickson, OTRL[11]

Physical therapist Brenda Yoder and occupational therapist Kim Hendrickson supplied a physical medical source statement dated April 27, 2016, that was approved by supervising psychologist Sarah DeBoard. (AR 1139 – 1142.) In their opinion, Petitioner would be unable to work a full eight-hour day without having to lie down for sixty minutes four times a day, that he would need unscheduled breaks of up to thirty minutes, and that he would be absent 50% of the time due to anxiety, cognitive deficits and pain. Yoder and Hendrickson commented also that Petitioner sometimes needs a cane for imbalance, and that he had reaching and manipulative limitations.

The ALJ gave this opinion "little weight" because it was based upon a short treatment period, Petitioner's medical records showed he did not use a cane for several months, and records indicated normal or benign mental status exams during the time frame of their treatment. Petitioner again argues that these reasons are not supported by substantial evidence in the record. The Court again agrees.

First, the relatively short time period may be true based upon the dates Yoder and Hendrickson treated Petitioner. They provided occupational therapy from March to May of 2016. However, Yoder noted she saw Petitioner seven times, while Hendrickson treated Petitioner fifteen times, during a three-month period. They each also provided a

---

[11] The ALJ considered the opinion authored by Yoder and Hendrickson, and reviewed by Sarah DeBoard Marion, Ph.D., as one opinion. (AR 25.) Petitioner in his brief referred to the opinion as that of Dr. DeBoard and Brenda Yoder, PT. It is the same opinion, however, the ALJ considered.

detailed narrative supported by their treatment notes. For instance, they stated, based upon their own observations, that Petitioner had difficulty with range of motion in his shoulder; he was unable to do ten single leg raises without his legs shaking from fatigue; he was unable to walk ten meters in ten seconds without his cane; his gait was inconsistent; and his performance in occupational therapy was variable due to pain and anxiety. They stated that, one day during an aquatic therapy session, he "froze on steps [and] stood there" for about three minutes before he could move again. (AR 1142.) In other words, although the temporal time period may have been short, both Yoder and Hendrickson had frequent and substantial contact with Petitioner, and recounted in detail their personal observations of Petitioner during treatment sessions of one hour each.

Second, the ALJ's stated reason for discounting the opinion on the grounds that Petitioner did not use a cane for several months directly conflicts with the ALJ's decision to give great weight to Dr. Holley's opinion that Petitioner must use a cane. In adopting Dr. Holley's opinion on that point, the ALJ stated that "the assessment for use of a cane is reasonably consistent with [Petitioner's] treatment records over time showing he has received treatment for fall injuries and has demonstrated balance difficulties." (AR 27.) The ALJ even included the use of a cane in his RFC determination. The ALJ's rationale for rejecting Yoder's and Hendrickson's opinion is distinctly at odds with the ALJ's acceptance of the use of a cane in reliance upon Dr. Holley's opinion.

Third, the ALJ may not rely upon a limited temporal time frame to discredit Yoder's and Hendrickson's opinion regarding the effects of Petitioner's mental

limitations upon his physical abilities. Here, the longitudinal evidence of record provides substantial evidence of the effects of Petitioner's anxiety and other mental health symptoms upon his ability to function. Yoder and Hendrickson were not providing a mental residual functional capacity assessment. They were, however, of the opinion that Petitioner's psychological conditions adversely impacted Petitioner's physical condition and abilities. (AR 1139.) They then included their personal observations of how Petitioner's psychological conditions affected his physical performance, such as freezing on the steps of the pool and being unable to move without verbal cues. (AR 1142.) Hendrickson explained that Petitioner's physical abilities were hampered by his anxiety, cognitive fatigue, and over-stimulation. (AR 1140.)

As explained, the Court finds the ALJ erred in giving the opinion of Yoder and Hendrickson little weight. The ALJ's determination was based upon reasons that are not supported by the record as a whole.

### D.    Sarah DeBoard, Ph.D.

Dr. DeBoard completed two additional medical source statements, one on November 30, 2016, and a second on March 7, 2017. (AR 1342, 1367.) In the first statement, she was asked to comment regarding whether Petitioner was malingering. She opined he was not, based upon having "treated [Petitioner] extensively." (AR 1342.) She agreed with Dr. Gage's evaluation that Petitioner suffered from a conversion disorder which, "by definition is not conscious; meaning non-deliberate." (AR 1342.) She stated that, although Petitioner improved with treatment, he was nevertheless disabled.

In March of 2017, she reiterated her prior opinions, indicating that, while improved, Petitioner was unable to meet competitive standards in several cognitive areas, such as remembering simple instructions, working in proximity to others without being unduly distracted, and performing at a consistent pace without an unreasonable number and length of rest periods. (AR 1364 – 65.) Dr. DeBoard explained that Petitioner's posttraumatic stress disorder caused significant psychological distress, and his conversion disorder caused significant and real pain. (AR 1365.) She also opined Petitioner would miss more than four days of work each month. (AR 1366.)

The ALJ accorded limited weight to both of Dr. DeBoard's opinions on the grounds that she misstated Dr. Gage's diagnosis of conversion disorder, which Dr. Gage had stated was "provisional," and Dr. DeBoard's records did not otherwise indicate how she determined Petitioner had conversion disorder; what symptoms were related to the disorder; or how the symptoms would cause him to miss so much work. (AR 26.) The ALJ determined also that Dr. DeBoard's opinion was entitled to limited weight because she did not consider Dr. Holley's diagnosis of histrionic personality disorder or the effect of Petitioner's sleep apnea findings on his mental condition. (AR 26.)

Petitioner argues the ALJ's stated reasons for according limited weight to Dr. DeBoard's opinions are neither specific nor legitimate, and are not supported by the record. The Court agrees, for the reasons that follow.

The ALJ overlooks Dr. DeBoard's January 27, 2016 independent neuropsychological consultation, performed upon referral by Whitehead-Price and Dr.

Holley. (AR 1222.) Dr. DeBoard reviewed Dr. Gage's May 2015 evaluation and noted that Dr. Redshaw's earlier diagnosis of conversion disorder in January of 2015 was consistent with Dr. Gage's provisional diagnosis of conversion disorder. (AR 1222.) Dr. DeBoard was of the opinion Petitioner exhibited "prominent" psychological difficulties, and could benefit from occupational therapy, which he then began with Yoder and Hendrickson in March of 2016. (AR 1223.) The ALJ's finding that Dr. DeBoard misstated Dr. Gage's diagnosis and that Dr. DeBoard's records did not indicate how she determined Petitioner had conversion disorder, misconstrues the evidence in the record. Dr. DeBoard performed an independent consultative examination, reviewed Dr. Gage's and Dr. Redshaw's earlier reports, and had the opportunity to observe Petitioner during occupational therapy sessions.

Next, it is unclear how providing an additional or alternative diagnosis of histrionic personality disorder would change Dr. DeBoard's stated opinion. Whatever the actual diagnosis, it was clear to all of Petitioner's medical care providers that he suffered from significant psychological and cognitive impairments. Whether the diagnosis was conversion disorder, somatoform disorder, histrionic personality disorder, or some other disorder, the nomenclature used to describe the disorder does not appear relevant to Dr. DeBoard's opinions based upon her own independent examination and personal observations of Petitioner during treatment. Further, the ALJ adopted the diagnosis of conversion disorder and histrionic personality disorder at step two, finding both severe.

Finally, Dr. DeBoard could not have considered Petitioner's sleep apnea findings

because her last examination of him occurred on July 1, 2016. (AR 1230.) Petitioner's sleep study — which showed markedly severe fragmentation of sleep with a combination of respiratory events and leg movements, and only mild sleep apnea — occurred on July 18, 2016. (AR 1239.) Although Dr. DeBoard's medical source statements were dated November 30, 2016, and March 7, 2017, the administrative record indicates she discharged Petitioner from her care on July 1, 2016, and there is no evidence Dr. DeBoard reviewed the sleep study results prior to authoring either one of her opinions.

The Court therefore finds the ALJ erred in giving Dr. DeBoard's opinions little weight, as his determination was not based upon specific, legitimate reasons supported by substantial evidence in the record.

### E. Ann Marie Reed, PRN, HNP

Ann Marie Reed began treating Petitioner in March of 2016, and saw Petitioner at least every two months. She provided two mental health assessments, the first dated July 4, 2016, and the second dated June 5, 2017. (AR 1232 – 1337; 1508 – 1513.) Both of Reed's opinions were consistent with one another. In each of the mental medical source statements, Reed was of the opinion Petitioner suffered from short term memory loss, mood swings, and disorganization. With regard to his ability to sustain full-time work on a consistent basis, Reed opined Petitioner was either seriously limited or unable to meet competitive standards in all areas of work-related activities. She explained that her opinions were based upon observations of Petitioner's memory loss, poor impulse control, and forgetfulness. In her opinion, Petitioner would be absent for more than four

work days each month. In her later report, she stated that Petitioner "will not fully recover. He will require ongoing assistance in healthy lifestyle choices and physical maintenance." (AR 1508.) She stated also her opinion that Petitioner's symptoms were most closely related to traumatic brain injuries, generalized anxiety disorder, and major depressive disorder. (AR 1510-11.)

The ALJ chose to give Reed's opinions "little weight" because they were inconsistent with Petitioner's normal brain MRI findings and normal EEG findings; his daily activities, which included his ability to make it to his medical appointments and travel to and from Nevada to "offer support to grieving friends;" and because Reed did not consider the diagnosis of histrionic personality disorder or the effects of Petitioner's sleep apnea findings on his mental functioning. (AR 27.) Petitioner again argues these reasons are not supported by substantial evidence in the record. And, the Court agrees.

While inconsistency with medical evidence can be a germane reason for discounting other source evidence, *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005), the particular medical evidence relied upon by the ALJ does not support his reasoning. First, Petitioner did not have normal EEG findings, as previously discussed. His first EEG revealed right central parietal dysrhythmia at the C4/P4 region. His ambulatory EEG study documented one clinical event with a total of three combined push button events. Second, Dr. Gage's neuropsychological evaluation objectively measured Petitioner's cognitive functioning, and found severe deficiencies in processing speed, fine motor dexterity, memory, and recall. Last, not one of Petitioner's treating

physicians or other health care providers questioned Petitioner's diagnoses of posttraumatic stress disorder, anxiety disorder, major depressive disorder, or possible conversion disorder, or their combined effects upon Petitioner's ability to function.

Next, while inconsistency with daily activities may also be a germane reason for discounting other source evidence, the ALJ overlooked the substantial evidence in the record that Petitioner required assistance to function on a daily basis. There is ample evidence in the record that Petitioner's wife compensated for Petitioner's inability to function. In multiple medical records, it is noted that she accompanied Petitioner to his appointments, because Petitioner did not drive. She also assisted her husband with showering, preparing meals, and caring for their dog, going so far as bagging the dog's food for the day so Petitioner would remember to feed their dog. (AR 22, 360-367.) And finally, Petitioner underwent occupational therapy treatment two separate times (with Hendrickson and Yoder, and later with Craig) to learn the skills necessary for independent functioning at a basic level – the occupational therapy was designed to increase Petitioner's ability to perform activities of daily living without his wife's assistance. (AR 22, 1146, 1502-1507.)

As for the references in the record to Petitioner's travel to Las Vegas, they are relatively sparse, and did not indicate frequent, independent travel. Rather, Petitioner and his wife lived in Las Vegas for a period of time in 2011, before Petitioner's amended onset date, and before they moved to Idaho. (AR 908.) Petitioner also lived in Las Vegas briefly between November of 2013 and approximately February of 2014, and again for

one month in October of 2016. (AR 1421, 1475.)[12] However, his temporary residency in

Las Vegas does not negate the substantial evidence in the record that Petitioner's wife

occupied the role of full-time care giver. (AR 367.) There is no evidence in the record to

support an inference that Petitioner traveled alone to Las Vegas or was able to live

independently while in Las Vegas. (*see, e.g.*, AR 1424, note by Brenda Yoder, PT, dated

April 10, 2015, of Petitioner's need for full time supervision due to severe anxiety; AR

1410, note by Reed on November 9, 2016, that his wife was managing Petitioner's daily

activities, such as helping him with food and dressing.).

Last, the ALJ offered no explanation regarding his conclusion that Reed's

opinions should be given little weight because Reed did not consider Dr. Holley's

alternative diagnosis of histrionic personality disorder or the diagnosis of sleep apnea. As

explained above, it is unclear to the Court how an alternative diagnosis, and the

consideration of Petitioner's fragmented sleep together with his other symptoms, would

have altered Reed's opinions. Upon review of Reed's two written assessments, Reed

explained she based her opinions upon her own clinical examination and assessment.

The Court therefore finds the ALJ erred in giving Ann Marie Reed's opinions

little weight, as his determination was not based upon germane reasons supported by

substantial evidence in the record.

---

[12] While there, he sought care from Hisana Qamar, M.D. On November 29, 2013, Dr. Qamar ordered a cervical MRI, and brain MRI. (796 – 797.)

**MEMORANDUM DECISION AND ORDER - 59**

### F.    Amanda Craig, OTR

Amanda Craig provided a medical source statement on May 30, 2017. (AR 1502 – 1507.) She provided occupational therapy to Petitioner eight times beginning in March of 2017. (AR 25, 1502.) Craig planned to see Petitioner approximately two to three additional times after the time she provided the statement. In her opinion, Petitioner was unable to consistently perform any physical, cognitive, emotional or visual tasks without symptoms of fatigue and stress or anxiety. Craig opined Petitioner was dependent upon his wife for support, and his symptoms increased with stress. Craig was of the opinion also that Petitioner would be absent from work more than four days each month.

Craig provided a lengthy narrative explaining her opinion that Petitioner would be seriously limited or unable to meet competitive standards in almost all areas of work-related activity. (AR 1504.) She stated Petitioner was:

> not able to consistently perform any physical, cognitive, emotional, or visual tasks without the onset of fatigue, stress/anxiety that he does not exhibit the coping skills for at this time, visual strain, cognitive confusion, attention deficits, and attention breakdowns, difficulty attending to [and] following written or verbal directions, and maintaining a safe balance and posture – all have been continually observed and documented in OT treatment.

(AR 1504, set forth verbatim.)

The ALJ gave Craig's opinions "limited weight" because Craig was not required to assess the etiology of Petitioner's conditions, and she did not cite objective evidence that would establish conversion disorder or the severity of his symptoms on a persistent

basis. The ALJ also found an inconsistency with Dr. Gage's findings and prior occupational therapy findings, which showed Petitioner did well in visual processing activities. And last, the ALJ noted Craig's opinion was inconsistent with "those documented periods when he has been more functional (e.g., most of 2016)." (AR 25.)

The Court finds the ALJ's reasons are not supported by substantial evidence in the record. The record does not support that Petitioner performed visual processing activities well. As Petitioner asserts, Dr. Gage specifically noted Petitioner's deficiencies in visual memory due to Petitioner's low processing speed. (AR 951 – 952.) Hendrickson's and Yoder's therapy consisted of addressing Petitioner's visual dysfunction with the use of binasal partial occlusion taping technique. (AR 1151.) Craig's therapy consisted of various treatment techniques to address Petitioner's visual scanning and visual motor processing speed. (AR 1502.) There is no support for the ALJ's determination that Petitioner performed well in visual processing activities.

Second, Craig was not diagnosing or treating Petitioner's mental health symptoms. Craig provided occupational therapy, and her treatment modalities included neurovisual postural rehabilitation, cognition tasks, and educational activities. (AR 1502.) She simply noted Petitioner's diagnoses of conversion disorder (which the ALJ found severe at step two), posttraumatic stress disorder, and major depressive disorder "per neuropsychology diagnosis." (AR 1502.) It is clear from Craig's statements that she was not providing a diagnosis, but was instead relying upon the diagnoses given by other medical providers, which are well documented in the record by Dr. Holley, Dr. Gage, Dr. Redshaw, Dr.

Piktel, Whitehead-Price, NP-C, Dr. DeBoard, Dr. Handy, Dr. Holweger, Dr. Bowman, and Lisa Lawrence, PMHNP.

Instead, Craig explained her role as an occupational therapist was to direct Petitioner along the path of "building healthy lifestyle habits and community support that will allow him to lead a functional and fulfilling life." (AR 1502.) She explained also that she observed and documented Petitioner's symptoms during occupational therapy treatment. Craig's treatment notes document the severity of Petitioner's symptoms, therefore providing the requisite evidence of the same.

Finally, the record does not support the ALJ's finding that Petitioner was "more functional" for most of 2016. Rather, the record demonstrates a waxing and waning of symptoms during 2016, based upon his positive response to occupational therapy and his functional decline after discharge. For example, in January and February of 2016, Dr. DeBoard referred Petitioner to occupational therapy, and Petitioner required a service dog. He improved somewhat upon discharge from occupational therapy (AR 1266), which Petitioner participated in twice weekly from March through May of 2016. Upon discharge, Hendrickson and Yoder reported Petitioner's functional limitations were "20% to less than 40% impaired." (AR 1181; *see also* AR 1226.)

However, by June and July of 2016, Petitioner sought an orthopedic referral for continued pain in his right shoulder; reported feeling as if he was sliding backward because he was no longer participating in occupational therapy; and underwent a sleep study which revealed markedly severe fragmentation of sleep. By August of 2016, Dr.

Holley noted an increase in emotional disturbances. Thus, it is unclear how the record supports the ALJ's determination that Petitioner's more functional status, after having benefited from occupational therapy, translates to an ability to work or supports the determination that Craig's opinions should be given little weight.

For the above reasons, the Court finds that the ALJ did not provide germane reasons supported by substantial evidence in the record to support his determination that Craig's opinions should be given little weight.

## 2.    Petitioner's RFC

As part of the fourth step in the sequential process, the ALJ assesses whether the Petitioner's medically determinable impairments prevent the claimant from performing work which the claimant performed in the past, i.e., whether the claimant has sufficient residual functional capacity to tolerate the demands of any past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). A claimant's residual functional capacity is the most he can do despite his limitations. 20 C.F.R. § 404.1545(a). An ALJ considers all relevant evidence in the record when making this determination. *Id*.  Generally, an ALJ may rely on vocational expert testimony. 20 C.F.R. § 404.1566(e); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). An ALJ must include all limitations supported by substantial evidence in his hypothetical question to the vocational expert, but may exclude unsupported limitations. *Bayliss*, 427 F.3d at 1217. The ALJ need not consider or include alleged impairments that have no support in the record. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1163–64 (9th Cir. 2000).

Petitioner argues the ALJ failed to consider his significant limitations in his ability to maintain a normal work schedule, and his limitations in reaching, fingering, and handling. Petitioner asserts that, had these limitations been accounted for, Petitioner would be precluded from all employment due to absences from work per the vocational expert's testimony. Assuming Petitioner could maintain regular attendance, Petitioner's limitations relating to fingering and handling would limit him to one job—that of fruit distributor. (AR 119.) For these reasons, the Petitioner argues the ALJ's RFC determination was in error.

First, as the Court found above, the determination of Petitioner's RFC is not free of legal error, because the ALJ did not properly evaluate the opinions of multiple treating sources. All of Petitioner's treating sources who provided physical capacity or mental capacity assessments were of the opinion Petitioner would miss four or more days of work each month. Yet, the ALJ discounted all of these opinions and did not provide either specific and legitimate, or germane, reasons supported by substantial evidence in the record for doing so. The ALJ did not explain what evidence contradicted the attendance limitations. Yet, the sheer number and consistency of medical appointments documented in the record alone support that Petitioner would miss substantial amounts of work time in order to attend medical appointments, occupational therapy appointments,

and physical therapy appointments.[13]

Second, it was observed on several occasions by numerous treating providers, such as Whitehead-Price and Dr. Holley, that Petitioner suffered from intermittent hand tremors and psychomotor agitation. Dr. Gage noted also that Petitioner scored in the first percentile on the pegboard test, revealing severe deficiencies with regard to fine motor dexterity. (AR 951.)

By failing to properly account for all of Petitioner's medically determinable impairments, the Court finds that substantial evidence does not support the ALJ's RFC determination.

## CONCLUSION

Considering the record as a whole, the Court concludes the ALJ did not give specific and legitimate reasons, or germane reasons, as the case may be, based upon substantial evidence in the record for discounting the multiple opinions of seven treating medical providers. The ALJ failed to identify inconsistencies in the assessments of the treating physicians and other medical care providers, and did not consider the record as a whole. Further, the ALJ did not apply the criteria set forth in 20 C.F.R. § 404.1527(c) when analyzing the opinions of Petitioner's treating physicians. Consequently, the ALJ's

---

[13] The Court provided an extensive discussion of Petitioner's medical treatment history precisely to illustrate why Petitioner would miss work more than four days each month. The longitudinal evidence of record reflects medical appointments as often as three times each week during some periods, and multiple medical appointment on a single day. Petitioner experienced also a hospitalization for a suicide attempt, and required occupational therapy to address his inability to perform basic activities of daily living.

RFC determination did not account for all of Petitioner's medically determinable impairments. The Court will remand this matter for further consideration, as Petitioner did not request that the Court consider the record for an award of benefits.[14]

---

[14] The Court notes, however, that a review of Petitioner's medical treatment history reveals consistency---both in terms of Petitioner's subjective complaints, and the opinions and observations of Petitioner's various treatment providers. And, there is the sheer volume of medical opinions. Here, it is not just one opinion – but eight. The Court finds it difficult to accept that the ALJ rejected all eight opinions from seven different treating medical and other sources who provided care to Petitioner over the course of four years, when the opinions all reached the same conclusion that Petitioner was precluded from competitive employment.

**MEMORANDUM DECISION AND ORDER - 66**

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Petition for Review (Dkt. 1) is **GRANTED**.

2)      This action shall be **REMANDED** to the Commissioner for further

proceedings consistent with this opinion.

3)      This Remand shall be considered a "sentence four remand,"

consistent with 42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852,

854 (9th Cir. 2002).

DATED: March 29, 2019

Honorable Candy W. Dale
United States Magistrate Judge